UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

| | |
|---|---|
| CHRISTA JEAN MOORE, ) | |
|     Plaintiff, ) | |
| ) | Civil Action No. 2:11-cv-0078 |
| v. ) | Judge Nixon/Brown |
| ) | |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social Security, ) | |
|     Defendant. ) | |

To:     The Honorable John T. Nixon, Senior Judge

### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI), as provided under Title XVI of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge are Plaintiff's Motion for Judgment on the Record and Defendant's Response. (Docket Entries 14, 15, 17). The Magistrate Judge has also reviewed the administrative record ("Tr."). (Docket Entry 11). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **GRANTED in part** and this action be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C § 405(g) for proceedings consistent with this Report and Recommendation.

### I. INTRODUCTION

Plaintiff filed her application for SSI on July 31, 2008, with an alleged onset date of January 2, 2007. (Tr. 96-100). Her claim was denied initially and upon reconsideration. (Tr. 51-55, 57-59). On March 15, 2010, at Plaintiff's request, a hearing was held before Administrative Law

Judge ("ALJ") James Sparks. (Tr. 27-46). ALJ Sparks issued a decision denying Plaintiff benefits on May 10, 2010. (Tr. 8-26).

In his decision denying Plaintiff's claims, the ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since July 28, 2008, the application date (20 CFR 416.971 *et seq.*).
2. The claimant has the following severe impairments: major depressive disorder, low IQ score, obesity, and fibromyalgia (20 CFR 416.920(c)).
3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) with occasional lifting of 50 pounds, frequent lifting of 25 pounds, and sitting, standing, and walking for 6 hours out of an 8 hour work day with normal breaks. The claimant is capable of understanding detailed tasks with some, but not substantial difficulties and cannot do so with complex tasks. The claimant is capable of concentrating and attending to the same tasks despite some difficulties and can interact with co-workers, supervisors and the general public without significant limitations. The claimant can adapt to work settings and changes as needed.
5. The claimant has no past relevant work (20 CFR 416.965).
6. The claimant was born on September 21, 1971 and was 36 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).
7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).
8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).
9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).
10. The claimant has not been under a disability, as defined in the Social Security Act, since July 28, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. 16-21).

The Appeals Council denied Plaintiff's request for review on June 7, 2011. (Tr. 1-6). This

action was timely filed on July 22, 2011. (Docket Entry 1).

## II. REVIEW OF THE RECORD

On March 11, 1997, Plaintiff complained of neck and back pain radiating into her shoulder to her primary care physician at Bledsoe County Primary Care Center.[1] (Tr. 302). She stated she had this pain for 4 years. The physician noted Plaintiff had mild scoliosis, but that would not cause this type of pain. *Id*.

Plaintiff was in a motor vehicle accident on or about November 28, 2006. On November 28, 2006, she complained of neck and knee pain in a follow-up appointment with her primary care physician at Bledsoe County Primary Care Center. (Tr. 298). She next complained of neck pain on January 12, 2007, noting that she was undergoing physical therapy. (Tr. 291). One month later, on February 12, Plaintiff's primary care physician indicated Plaintiff's physical therapy was completed, but she continued to complain of neck and shoulder pain that worsened when she lifted anything. (Tr. 289). Plaintiff had a normal MRI of the cervical spine on February 21, 2007. (Tr. 328-30). On February 26, 2007, she again complained of neck and shoulder pain on the left side and noted she was unable to push anything without a lot of pain. (Tr. 288). Plaintiff next complained of left side pain to her primary care physician on May 17, 2007. (Tr. 283).

On May 18, 2007, she stated she was repeatedly forgetting things and was unable to deal with her children. She also described having problems with her left shoulder and neck since the age of 18. (Tr. 282). On May 24, 2007, Plaintiff's primary care physician described her as depressed, and Plaintiff described feeling shaky and nervous and having spells. (Tr. 280).

---

[1] Plaintiff apparently used Bledsoe County Primary Care Center as her primary care provider for all relevant dates.

At an appointment with her primary care physician on September 6, 2007, Plaintiff complained of her neck hurting and having difficulty picking up items. (Tr. 273). She was referred to an orthopedic specialist.

Plaintiff was referred to Scenic City Orthopaedics & Sports Medicine on September 24, 2007. (Tr. 201-03). Her ongoing neck and shoulder pain were evaluated. Dr. Eric Clarke noted Plaintiff was in no acute distress and had full range of motion in her cervical spine and upper extremity. He recommended physical therapy treatment, activity modification, and oral anti-inflammatory medication.

On September 26, 2007, Plaintiff returned to her primary care physician after her orthopedic visit, and she was referred to pain management and physical therapy. (Tr. 270).

Plaintiff began treatment at the Pain Center of Crossville on October 15, 2007. (Tr. 204-20). An MRI of the left shoulder on October 15, 2007 showed mildly downsloping acromion causing some mild impingement on the supraspinatus tendon but no obvious rotator cuff tear or muscle retraction. (Tr. 220). On October 30, 2007 and November 13, 2007, Plaintiff reported that the medications were not controlling her pain, and the injections were lasting only a week. (Tr. 212, 215). On November 28, 2007, she stated the medications were helping some but the injections were not helping much. (Tr. 209). On the same date, Plaintiff had an x-ray myelogram of her cervical spine, which was normal, as well as a negative CT of the cervical spine post myelography. (Tr. 218-19). At an appointment on December 12, 2007, Plaintiff complained of cervical pain with radiculopathy to the left forearm with an onset date of 1991. (Tr. 206). She described the pain as aching, sharp, dull, burning, constant and chronic. *Id*. Plaintiff indicated on that date she needed a new provider, as the Pain Center of Crossville no longer accepted her insurance. *Id*.

Plaintiff began treatment with M. Amjad Munir, M.D., on January 18, 2008. (Tr. 249-50). Dr. Munir noted Plaintiff had neck pain since 1995. She also suffered from aching, throbbing, and numbness in the hands, and the neck pain radiated down to both upper extremities and hands, but moreso on the left side. The pain averaged a 5 or 6 on a 10-point scale, and laying down helped, while doing any activity exacerbated the pain. The pain interfered with Plaintiff's general activity, mood, normal working, sleeping, enjoyment of life, and ability to concentrate, but not with her relationships with other people. Dr. Munir described a fairly normal range of motion in the cervical spine and normal range of motion in the upper extremities, but sensations were slightly decreased to light touch on the left first and second digits, and Plaintiff had multiple tender areas. He diagnosed myofacial pain. *Id*.

On February 4, 2008, Plaintiff told Dr. Munir she had no relief from pain medication, and the pain was at 6 to 8 on a 10-point scale. (Tr. 248). She believed her left hand grip was weakening. Dr. Munir noted after examination that Plaintiff had a slightly decreased left hand grip. *Id*. On the same date, Plaintiff had an EMG of the left upper extremity, which was normal. (Tr. 251).

At office visits in March and April, Plaintiff described her pain as a 2 to 6 and 3 to 6 on a 10-point scale. (Tr. 246-47). She noted Darvocet was ineffective. At the April appointment, Dr. Munir noted Plaintiff showed some features of fibromyalgia and discussed the disease with her. (Tr. 246).

At a May 7, 2008 appointment with Dr. Munir, Plaintiff noted she had pain in her shoulder, feet, toes, and back of leg and that she feels tired most of the time. (Tr. 245). She also had numbness and tingling in the feet and hands, and her pain ranged from 4 to 8 on a 10-point scale.

*Id*. Dr. Munir noted multiple tender areas in the upper and lower part of the body including the occipital supra and infra spinatus muscles, cervical paraspinal muscles, lumbar paraspinal muscles, gluteal area around the knee, and elbow area. *Id*. At her next appointment, on June 4, 2008, Plaintiff told Dr. Munir she had done some research on the internet and believed her symptoms fit very well with the symptoms of fibromyalgia. (Tr. 244). Her pain ranged from 6 to 8 on a 10-point scale, sometimes improving to 4. *Id*. On July 2, 2008, Plaintiff noted Darvocet was effective for less than 12 hours, and cold weather and fluctuation in temperature increased her pain. (Tr. 243).

On August 13, 2008, Plaintiff complained of her right hand feeling as if it has been asleep for two days and of pain in the back of her neck. (Tr. 334).

In a Function Report dated September 3, 2008, Plaintiff stated she cares for her children and washes clothes if she feels well. (Tr. 125). She feeds the family's indoor dogs, with help. (Tr. 125). She prepares meals about twice per week, typically frozen dinners or sandwiches. (Tr. 126). She goes grocery shopping approximately once per month. (Tr. 127). She seldom socializes with others due to her lack of energy and irritable bowel syndrome. (Tr. 128-29). She has problems lifting any weight. (Tr. 129).

Reeta Misra, M.D., completed a consultative RFC assessment dated November 18, 2008. (Tr. 335-43). Dr. Misra believed Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for about 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday. Plaintiff was limited to occasional balancing and limited reaching. Dr. Misra noted Plaintiff was credible except that there was no evidence regarding Plaintiff's alleged irritable

6

bowel syndrome, which made Plaintiff's allegations partially credible.[2]

Plaintiff began treatment at the Center for Spine, Joint, and Neuromuscular Rehabilitation in December 2008. (Tr. 371-94). On February 6, 2009, she complained of neck pain with left shoulder pain and lower back pain with left hip and leg pain, which she rated an 8 on a 10-point scale. The goal for treatment was a 4 on a 10-point scale. Plaintiff was noted to have myofascial pain syndrome and fibromyalgia. (Tr. 392-93). At a follow-up on March 9, 2009, Plaintiff noted the medications were not working well, and her pain remained the same since the last visit at an average of 6 on a 10-point scale. (Tr. 390-91). She did not complain of drug side-effects. *Id*.

On March 8, 2009, Plaintiff stated her pain was a 10 on a 10-point scale and had been, on average, an 8 on a 10-point scale since her last visit. The physician prescribed trigger point injections. (Tr. 388-89). On May 6, 2009, Plaintiff informed her physician that the trigger point injections provided no relief and that her medications were not working well. Her pain averaged an 8 on a 10-point scale, and she experienced constant aching over her entire body that affected all her activities of daily living. The doctor prescribed a trail of Savella. (Tr. 386-87). At an appointment on June 4, 2009, Plaintiff reported that the Savella was helping her pain and making her feel like she had more energy, but her pain was, on average, a 6 on a 10-point scale. Savella was discontinued because her insurance would not pay for it. (Tr. 384-85).

Plaintiff had an MRI on June 23, 2009, which was normal with the exception of a slight minimal prominence of some disc material posterior to the right side at the T11-12 area. (Tr. 394).

---

[2] It is unclear to the Magistrate Judge why Dr. Misra saw no evidence of Plaintiff's alleged irritable bowel syndrome, as there are several references to it from Plaintiff's primary care physician. (Tr. 260-332).

On July 2, 2009, Plaintiff stated that the medications were not working well, and she was experiencing itching and insomnia. Her pain averaged 6 on a 10-point scale. (Tr. 382-83). Plaintiff's prescription for Savella was refilled. *Id*. On August 31, 2009, Plaintiff reported that her pain was the same, aching, stabbing, sharp, and shooting. The medications were working "somewhat" well to lessen the pain, but she had itching and constipation. Savella was not available due to insurance constraints. Her pain was an 8 on a 10-point scale. The physician opted to continue Plaintiff's current pain management strategy "since it allows patient to be more functional" and renew her current medications "since they allow patient to function more normally and have a higher quality of life." (Tr. 380-81).

At an appointment on September 30, 2009, Plaintiff noted her pain was "a little better" since her last visit, and the medications were working to lessen pain "a little" but not lasting 12 hours. Her pain was an average of 8 on a 10-point scale. (Tr. 378-79). Similarly, Plaintiff reported on October 30, 2009 that her pain was the same since the last visit, but the medications were working well to lessen her pain. She was experiencing nausea and excessive daytime drowsiness, however, and her pain averaged an 8 on a 10-point scale. (Tr. 376-77).

On November 30, 2009, Plaintiff noted her pain was better since the last visit, averaging a 6 on a 10-point scale, but she was not able to do much. Trigger point injections were prescribed. (Tr. 374-75). On January 25, 2010, Plaintiff reported her pain was the same since the last visit, and the medications were working well to lessen her pain to a 6 on a 10-point scale. She had difficulty doing anything active. Trigger point injections were again prescribed. (Tr. 372-73).

Benjamin Johnson, M.D., Plaintiff's treating physician from the Center for Spine, Joint and Neuromuscular Rehabilitation, provided a medical opinion form dated February 23, 2010. (Tr. 175,

433). He believed Plaintiff was unable to lift more than 10 pounds, with no repetitive lifting under 10 pounds. Typing and keyboard use were limited to no more than 1 hour. She cannot sit or stand more than 15 minutes at a time, cannot stay seated more than 2 hours, and must be allowed to recline or lie down up to 2 hours per day. In Dr. Johnson's opinion, Plaintiff's employer must take into account her need for the use of pain medication and its side effects. While he began treating her on December 8, 2008, he believes these restrictions would be in place from January 2, 2007 until present.

At her hearing, Plaintiff testified that she left school in the tenth grade and was in special education classes in high school. (Tr. 30). She has difficulty reading. (Tr. 34).

Plaintiff has been treated for fibromyalgia, irritable bowel syndrome, and depression. (Tr. 30). She has pain in her left shoulder, neck, arm, and left leg. *Id*. Medications relieve her pain to a 5 on a 10-point scale, with 10 being the worst pain. (Tr. 31). Her average pain level is a 5 or 6 on a 10-point scale. (Tr. 32). Her pain is treated with injections at her trigger points, which cause additional pain for a few days. (Tr. 38).

Plaintiff stated she can stand for 15 to 20 minutes, and it is difficult for her to bend, stoop, or squat. (Tr. 31). She can lift less than 2 pounds. (Tr. 31). Plaintiff testified that she cannot lift her grandchildren, who weigh 18 and 20 pounds, but she did carry one to the mailbox approximately 40 feet from her door and was "done for" by the time she returned to the house. (Tr. 31, 36-37). She drops a lot of items she grasps with her left hand, and wearing a watch bothers her wrist. (Tr. 38-39). Her right arm does not bother her as much as her left arm. (Tr. 39).

Plaintiff's condition is worsened by cold weather. (Tr. 33). She has approximately six bad days per week, and she spends the majority of about five days per week in bed. (Tr. 34-35). She

holds her left arm close to her body to avoid pain. (Tr. 35-36). She once woke up and could not walk due to foot pain for two weeks. (Tr. 39).

Plaintiff testified she has mental therapy at Volunteer Behavioral Health Center. (Tr. 32). She has problems concentrating and with crowds. *Id*. She also suffers from insomnia and takes Ambien to help her sleep. *Id*.

Plaintiff lives with her significant other, her 19-year-old daughter, her 11-year-old twin children, and her 1-year-old twin grandchildren. (Tr. 33, 36-37). Her elder daughter helps with household chores and does the laundry and most of the cooking. (Tr. 32-33). Plaintiff is able to prepare simple meals like sandwiches. (Tr. 32-33). Plaintiff also cares for her 11-year-old twins. (Tr. 33). Plaintiff's elder daughter helps the 11-year-olds with their homework. (Tr. 38). Plaintiff does not care for her grandchildren unless her 11-year-old children are also at home to help. (Tr. 36-37). She is able to sometimes watch television and use the computer. (Tr. 33).

Vocational Expert ("VE") Edward Smith testified regarding the availability of jobs for a hypothetical individual Plaintiff's age and with a 10th grade education[3] but who could walk, sit, and/or stand 6 hours in an 8-hour workday; could occasionally lift 50 pounds and frequently lift 25; could understand and remember detailed tasks with some but not substantial difficulty; could not understand and remember complex tasks; could concentrate and attend to the detailed tasks despite some difficulty; could not interact with coworkers, supervisors, and the public without significant limitations; and could adapt to work-like settings and changes as needed. (Tr. 41-42). VE Smith believed such an individual could work in medium unskilled jobs, including as a hand

---

[3] There was some dispute at the hearing regarding whether Plaintiff had completed more high school education than 10th grade, but the ALJ specifically used a 10th grade education in his hypothetical.

packager (3,300 in Tennessee/127,000 nationwide), as a machine cleaner (3,400 in Tennessee/151,000 nationwide), or as a linen room attendant (1,300 in Tennessee/60,000 nationwide). (Tr. 41-42). If Plaintiff's testimony was given full credibility, she would not be employable. (Tr. 42).

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Because the Magistrate Judge believes this action should be remanded pursuant to sentence four of 42 U.S.C § 405(g), only Plaintiff's first error has been considered. Plaintiff claims the ALJ failed to set forth good cause for his rejection of the opinion of Dr. Benjamin Johnson, and the Magistrate Judge agrees.

A.   Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record

was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.      Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[4] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4.  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5.  Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

---

[4] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.*; *see also Moon*, 923 F.2d at 1181. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through VE testimony. *See Wright*, 321 F.3d at *616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); *see also Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

C.     The ALJ Erred in His Rejection of Dr. Johnson's Opinion

The ALJ considered and rejected Dr. Johnson's opinion. (Tr. 19-20, 175, 433). Dr. Johnson treated Plaintiff at the Center for Spine, Joint and Neuromuscular Rehabilitation beginning in December 2008. (Tr. 175, 433). If accepted in its entirety, Dr. Johnson's opinion essentially disqualifies Plaintiff for employment, as Plaintiff must be allowed to recline or lie down up to 2 hours in an 8-hour workday. (Tr. 175, 433).

In rejecting this opinion, the ALJ noted Plaintiff's "condition responded to medication" and that Plaintiff was able to complete "extensive activities of daily living including caring for her 11 year old twins and doing many household chores." (Tr. 19). The ALJ apparently completely

rejected Dr. Johnson's opinion and instead relied primarily on the opinion of non-examining consultant Dr. Misra, who found Plaintiff capable of medium work. (Tr. 335-43).

An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time. 20 C.F.R. § 404.1527(d)(2)(I)-(ii). If there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency with the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004). Additionally, it should be noted that a treating physician's statement that the claimant is "disabled" does not bind an ALJ as the definition of disability requires consideration of both medical and vocational factors. 20 C.F.R. § 404.1527(e)(1); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

The Magistrate Judge believes the ALJ's assessment of Dr. Johnson's opinion as having

14

minimal evidentiary weight was not supported by substantial evidence. Plaintiff has a long history of pain in her neck and back, with medical treatment dating back to 1997. (Tr. 302). Plaintiff has attempted a number of pain management techniques, including trigger point injections and medication. (Tr. 202-40, 243-50, 371-94). At the Center for Spine, Joint, and Neuromuscular Rehabilitation, the stated pain management goal at every visit was a 4 on a 10-point scale. (Tr. 371-94). Plaintiff never achieved relief greater than a 6 on a 10-point scale and frequently measured her pain at an 8. *Id*. While there are indications in Plaintiff's medical records that medication helps with the pain, Plaintiff has never consistently realized relief to her physicians' desired level. (Tr. 202-40, 243-50, 371-94). Since 2009, Plaintiff has never achieved relief greater than a 6 on a 10-point pain scale.

The ALJ also notes Plaintiff's activities of daily living, which includes caring for her 11 year old twins and 1 year old grandchildren and doing household chores. Plaintiff's testimony and her medical records, however, do not provide significant evidence for this conclusion. Plaintiff told her psychiatrist in March 2009 that her daughter expected Plaintiff to care for her newborn twins, and Plaintiff was upset because, "I'm in pain and she doesn't care." (Tr. 421). Plaintiff also complained in September 2009 that she helped her daughter watch the two infants "most of the time" and was "getting tired of it." (Tr. 428). At the hearing, Plaintiff testified that she only watched her one year old grandchildren if her twins were home. (Tr. 36-37). She carried one of the twins, weighing 18 to 20 pounds, to the mailbox (approximately 40 feet) and was "done for" by the time she returned to the house and could no longer hold the child. (Tr. 31). Plaintiff also noted that her elder daughter does most of the cooking and does the laundry, as well as helping the 11 year old twins with their homework. (Tr. 33, 38).

The Magistrate Judge believes the ALJ did not have substantial evidence for giving essentially no weight to the opinion of Dr. Johnson. Plaintiff's condition responded only minimally to medication and treatment. Moreover, referring to Plaintiff's activities of daily living as "extensive" appears to be completely without merit based on the record. (Tr. 19). The Magistrate Judge believes remand to the Commissioner is appropriate where, as here, the ALJ based his evaluation of a treating physician's opinion on conclusions for which he did not have substantial evidence.

## IV. RECOMMENDATION

For the reasons set forth above, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **GRANTED in part** and this case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C § 405(g) for proceedings consistent with this Report and Recommendation.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 21st day of June, 2012.

/S/ Joe B. Brown
_____
JOE B. BROWN
United States Magistrate Judge